**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

**BRADLEY C. MORGAN,**

                                   **Plaintiff,**                          **18-CV-747Sr**

**v.**

**COMMISSIONER OF SOCIAL SECURITY,**

                                   **Defendant.**

## DECISION AND ORDER

As set forth In the Standing Order of the Court regarding Social Security

Cases subject to the May 21, 2018 Memorandum of Understanding, the parties have

consented to the assignment of this case to the undersigned to conduct all proceedings

in this case, including the entry of final judgment, as set forth in 42 U.S.C. § 405(g). Dkt.

#16.

## BACKGROUND

Plaintiff applied for supplemental security income ("SSI"), benefits with the

Social Security Administration ("SSA"), on April 11, 2014, alleging disability beginning

January 1, 2002, at the age of 19, due to anxiety disorder, post traumatic stress

disorder ("PTSD"), and depressive disorder. Dkt. #7, p.157. The individual assisting

plaintiff with the filing of his application noted that plaintiff

> didn't have medical info readily available. I had to find the
> medical sources from the last filing. He also couldn't tell me
> if he graduated in 2012 or 2013. He had to look at his

> diploma to tell me what year. Claimant asked a lot of basic questions with his grandmother's help. He couldn't tell me if he had a bank account, where it was, or how much was in it without her help. He also couldn't tell me approximate dates without her help.

Dkt. #7, p.153.

On March 2, 2017, plaintiff appeared with counsel and testified, along with an impartial vocational expert ("VE"), Jane Gershwin, at an administrative hearing before Administrative Law Judge ("ALJ"), John Molanson. Dkt. #7, pp.39-58. At the outset of the hearing, the ALJ noted that plaintiff appeared nervous and advised him to try and relax. Dkt. #7, p.41. Plaintiff testified that he had received a high school diploma from Hutchinson Central Technical High School. Dkt. #7, p.43. He attended counseling every other week and saw his psychiatrist every other month. Dkt. #7, pp.45-46. He was also attending a program to find new ways to cope with trauma. Dkt. #7, p.46. Plaintiff testified that his mother sexually assaulted him as a young child, constantly beat him and attempted to drown him in a tub of very hot water. Dkt. #7, p.47. When he encounters his mother, or people similar to her, he tends to have palpitations and sometimes a panic attack where he cannot breathe and blacks out. Dkt. #7, p.48. This happens about four times per month and is also triggered when he is faced with a situation he feels ill equipped to handle, such as his attempt at college. Dkt. #7, pp.49-50.

Plaintiff had applied for part-time work at Game Stop and Bak USA because his grandmother was now retired and lacked sufficient retirement income, but

he did not believe he could work full-time without having another emotional break down. Dkt. #7, pp.51-52. He was open to participating in a work program or seeking independent living, but testified that it was hard to get into the right frame of mind to pursue such options. Dkt. #7, p.52. He testified that he was trying to leave the house more, like going out to eat or play billiards with his godfather on a weekly basis, but it was pretty hard for him to do given his emotional status. Dkt. #7, p.54.

On a typical day, plaintiff testified that he would make himself a cup of tea, shower, brush his teeth, read, play his guitar, play video games and eat leftovers or cereal. Dkt. #7, p.53. He tries to keep himself from slipping into a mental break down by talking to online friends or family, playing video games and looking for part-time work. Dkt. #7, pp.53-54. He testified that other than his grandmother and godfather, he doesn't keep in close contact with his family much because they view him as a bit of a black sheep and that he doesn't have any personal friends locally. Dkt. #7, p.54. He recognizes that he is not a people person and could not handle the stress of service jobs. Dt. #7, p.55. He has had difficulty learning to do laundry or to cook, which he recognized as important life skills. Dkt. #7, p.55.

When asked to assume an individual with a high school diploma who, on a sustained competitive basis, can understand and remember simple instructions, use judgment in making simple work-related decisions, respond appropriately to supervisors, co-workers and usual work situations not involving the public, and can adapt to changes in the ordinary work setting, the VE testified that the unskilled

occupational base would be limited by 60% but that such an individual could work as a lumber sorter. Dkt. #7, pp.43.44. The VE testified that this position was not collaborative and did not require public interaction but would require a certain level of production. Dkt. #7, pp.43-44.

The case was reassigned to ALJ Linda J. Helm, who rendered a decision that plaintiff was not disabled on June 8, 2017. Dkt. #7, pp.21-34. The Appeals Council denied review on May 14, 2018. Dkt. #7, p.5. Plaintiff commenced this action seeking review of the Commissioner's final decision on July 6, 2018. Dkt. #1.

## DISCUSSION AND ANALYSIS

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 496, 501 (2d Cir. 2009). If the evidence is susceptible to more than one rational interpretation, the Commissioner's determination must be upheld. *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014). "Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner." *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998).

To be disabled under the Social Security Act ("Act"), a claimant must establish an inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 20 C.F.R. § 404.1505(a). The Commissioner must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. § 404.1520(a). At step one, the claimant must demonstrate that he is not engaging in substantial gainful activity. 20 C.F.R. § 404.1520(b). At step two, the claimant must demonstrate that he has a severe impairment or combination of impairments that limits the claimant's ability to perform physical or mental work-related activities. 20 C.F.R. § 404.1520(c). If the impairment meets or medically equals the criteria of a disabling impairment as set forth in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"), and satisfies the durational requirement, the claimant is entitled to disability benefits. 20 C.F.R. § 404.1520(d). If the impairment does not meet the criteria of a disabling impairment, the Commissioner considers whether the claimant has sufficient RFC for the claimant to return to past relevant work. 20 C.F.R. § 404.1520(e)-(f). If the claimant is unable to return to past relevant work, the burden of proof shifts to the Commissioner to demonstrate that the claimant could perform other jobs which exist in significant numbers in the national economy, based on claimant's age, education and work experience. 20 C.F.R. § 404.1520(g).

In the instant case, the ALJ made the following findings with regard to the five-step sequential evaluation: (1) plaintiff had not engaged in substantial gainful

activity since he filed his application for benefits on April 11, 2014; (2) plaintiff's major depressive disorder, generalized anxiety disorder, PTSD and paranoid personality disorder constitute severe impairments; (3) plaintiff's impairments did not meet or equal any listed impairment; (4) plaintiff retained the residual functional capacity to perform work at all exertional levels with the following limitations: on a sustained, competitive basis, plaintiff can understand and remember simple instructions, use judgment in making simple work-related decisions, respond appropriately to supervisors, co-workers and usual work situations not involving the public, and adapt to changes in the ordinary work setting; and (5) plaintiff was capable of performing work as a lumber sorter and was not, therefore, disabled within the meaning of the SSA. Dkt. #7, pp.26-34.

Plaintiff argues that the combined effect of his major depressive disorder, PTSD and Paranoid Personality Disorder ("PDD"), meet the paragraph A and C criteria of listing 12.04 for an affective disorder at step 3 of the sequential evaluation. Dkt. #12-1, pp.21-25. Specifically, plaintiff argues that he has never lived independently and has received continuous mental health treatment for nearly four years with little or no progress. Dkt. #12-1, pp.23-24. Alternatively, plaintiff argues that the ALJ's RFC is not supported by substantial evidence and that the evidence is clear that plaintiff is incapable of sustained full time work. Dkt. #12-1, pp.28-30.

The Commissioner responds that the ALJ properly relied upon state agency medical consultant, Dr. Kamin's opinion that plaintiff's condition did not meet the paragraph C criteria for listing 12.04. Dkt. #15-1, pp.11-17. The Commissioner

further argues that the ALJ accounted for plaintiff's limitations in the RFC, which is supported by substantial evidence. Dkt. #15-1, pp.19-26.

The ALJ determined that plaintiff's mental impairments did not meet the paragraph C criteria of Listing 12.04 because his

> mental disorder is not "serious and persistent" and with evidence of both medical treatment that is ongoing and diminishes the symptoms and signs of the mental disorder(s) and marginal adjustment, meaning a minimal capacity to adapt to changes in one's environment or to demands that are not already part of one's daily life. As detailed in this Decision, the [plainitff's] psychiatrist states that the approriate level of care for the claimant is outpatient therapy and bimonthly medication management, and the claimant at times has been unwilling to try recommended medications. Nevertheless, he has often been described as having neutral or euthymic mood and affect, and while he had one discrete crisis intervention in approximately July 2014, he has otherwise been able to cope with stressors and symptoms without needing a higher level of care, as detailed below.

Dkt. #7, p.28.

Plaintiff has the burden of proving that he meets the Listing requirements at step 3. *Naegele v. Barnhart*, 433 F. Supp.2d 319, 324 (W.D.N.Y. 2006). For a plaintiff to show that his impairment matches a listing, it must meet all of the specified medical criteria; an impairment that manifests only some of those criteria, no matter how severely, does not qualify. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). To show that he meets the criteria, plaintiff must offer medical findings equal in severity to all requirements and those findings must be supported by medically acceptable clinical

and laboratory diagnostic techniques. *Distefano v. Berryhill*, 363 F. Supp.3d 453, 465 (S.D.N.Y. 2019). Where the plaintiff's symptoms, as described by the medical evidence, appear to match those described in the Listings, the ALJ must provide an explanation as to why the plaintiff failed to meet or equal the Listings. *Kuleszo v. Barnhart*, 232 F. Supp.2d 44, 52 (W.D.N.Y. 2002).

Listing 12.04[1] sets forth the medical criteria for affective disorders. Specifically, Listing 12.04 provides that the required level of severity for an affective disorder, which is characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome generally involving either depression or elation, is met when the requirements in both paragraphs A and B are satisfied, or when the requirements in A and C are satisfied. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

The ALJ's determination that plaintiff's major depressive disorder constitutes a severe impairment satisfies paragraph A. *Gabriel v. Comm'r of Soc. Sec'y*, 6:18-CV-671, 2019 WL 4466983, at *8 n.8 (N.D.N.Y. Sept. 18, 2019). Paragraph C of Listing 12.04 provides as follows:

> C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or

---

[1] Modifications to Listing 12.04 and 12.06 (anxiety related disorders), and new Listing 12.15 (PTSD), became effective for all claims pending as of January, 17, 2017.

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

To satisfy the Paragraph C criteria, plaintiff's mental disorder must be "serious and persistent." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 (A)(2)(c). To be deemed serious and persistent, a plaintiff must rely, on an ongoing basis, upon medical treatment, mental health therapy, psychosocial support or a highly structured setting to diminish the symptoms and signs of a mental disorder and, despite such diminished symptoms and signs, the plaintiff has achieved only marginal adjustment. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(G)(2)(b) & (c). The regulations set forth the following regarding structured and supportive settings:

> Particularly in cases involving chronic mental disorders, overt symptomatology may be controlled or attenuated by psychosocial factors such as placement in a hospital, halfway house, board and care facility, or other environment that provides similar structure. Highly structured and supportive settings may also be found in your home. Such settings may greatly reduce the mental demands placed on you.

20 C.F.R. 404 Subpt. P, App. 1, §§ 12.00(F) (2016). Marginal adjustment means that a plaintiff's adaptation to the requirements of daily life is fragile; that is, plaintiff has minimal capacity to adapt to changes in his environment or to demands that are not

already part of his daily life. *Withus v. Saul*, 18-CV-10923, 2019 WL 6906972, at *20

(S.D.N.Y. Dec. 19, 2019), *citing* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(g)(2)(c).

The record before the Court clearly establishes that plaintiff's mental

disorders are serious and persistent. Plaintiff was admitted to the psychiatric unit at

ECMC between January 19, 2011 and January 24, 2011, at the age of 16, following an

emotional outburst in his home. Dkt. #7, pp.207-209. He was diagnosed with pervasive

developmental disorder and impulse control disorder and discharged with instructions to

continue his psychiatric medication and psychological counseling. Dkt. #7, p.209.

Plaintiff graduated from an 8:1:1 self contained class at Hutchinson

Technical High School in 2013. He commenced classes at Erie Community college, but

did not finish his freshman year due to anxiety. Dkt. #7, pp.453-454.

A neuropsychological evaluation of plaintiff, conducted by Joy Parrish,

Ph.D., Board Certified in Clinical Neuropsychology, on November 20-21, 2013, when

plaintiff was 18, revealed that plaintiff

> constantly returns to themes of discrimination, people
> ruining his life, holding him back, treating him unfairly or not
> caring about him. this is not just in relation to history of
> abuse and bullying and appears quite excessive. He
> describes deep personal offense due to minor, everyday
> family incidents. Mood is dysphoric and angry. Affect is
> consistent with mood and congruent to conversation. He
> reports difficulty regulating his mood. For example, several
> days ago he became so depressed thinking about how
> unfairly he has been treated, discrimination in general and
> poor future prospects due to discrimination that he canceled

school plans and stayed in bed for the majority of the day. This is not uncommon. He reports intense feelings of inadequacy.

Dkt. #7, p.305. Dr. Parrish noted that plaintiff

has a long history of chronic traumatic experiences and carries diagnoses of anxiety disorder, depressive disorder and PTSD, none of which have improved after many years of counseling. It appears that prior adverse experiences have affected [plaintiff] profoundly, impacting personality development. He is too quick to believe that he is being treated unfairly and that others undermine his interests and purpose. It was evident during the interview that [plaintiff] misconstrues neutral experiences as personal insults. His anxiety and depressive disorders are related to paranoid personality (*e.g.*, constant scanning for signs of danger, catastrophic reactions for setbacks).

Dkt. #7, p.307. Dr. Parish opined that plaintiff's prognosis was guarded, noting that "[p]harmacotherapy for symptoms of depression and anxiety will likely be helpful in day to day productivity but the overall features of distrust and suspiciousness will likely persist." Dkt. #7, p.307. Although noting that plaintiff was currently doing well with the flexible schedule of being a college student, Dr. Parrish opined that plaintiff's

depressive episodes would interfere with work productivity. Additional psychiatric presentation (paranoia) will likely make maintenance of employment very difficult. At this time, he is not disabled from employment based on cognitive ability. However, he appears at least partially disabled from competitive employment based on psychiatric presentation.

Dkt. #7, p.309.

On April 8, 2014, progress notes from Child & Family Services - Family Mental Health indicate concerns by plaintiff's grandmother regarding plaintiff's isolation, poor hygiene and lack of progress, noting that his symptoms and behaviors had

deteriorated. Dkt. #7, p.469. Plaintiff's therapist noted that plaintiff

> seems to be unwilling to accept some responsibility for his
> situation and well-being (even in his interactions with this
> writer); attempts by [grandmother] to encourage him to sleep
> better hours, leave the home, or care for his hygiene are met
> with increasing hostility. [Grandmother] was provided with
> some contact information for resources that may help her
> explore assisted living options for [plaintiff], as her own
> health is at risk by having him in her home. [Plaintiff]
> expressed interest in this during session with writer and may
> be agreeable to exploring these options. [Plaintiff] would
> need assisted living due to poor adaptive
> functioning/independent living skills.

Dkt. #7, p.469.

A psychiatric progress note from Denise Giessert, MD, Consultant

Psychiatrist at Child & Family Services dated April 22, 2014 reports that plaintiff

> is struggling to manage PTSD related reactivity, depressed
> mood and anxiety. He has anxiety and panic with avoidance
> often interfering with his functioning. He isolated himself at
> home, struggles with hygiene, feeling paranoid and
> persecutory by other [sic]. He is struggling to manage in his
> grandmother's home and it appears that more of a
> supervised living setting would be appropriate for him in the
> future. He needs help with ADL skills and [is] resistant to
> working with his grandmother on these issues. He is also
> hostile towards her when she encourages him to maintain a
> good sleep or hygiene routine.

Dkt. #7, p.521. Dr. Giessert's mental status exam revealed:

> He has odd social mannerisms and goes off on tangents.
> Speech is somewhat rambling and monotone, but otherwise
> coherent, somewhat loud. Mood is stated as: "I still being
> [sic] anxious and depressed, but also angry." His affect
> appears to be somewhat anxious at times, more angry and
> mod congruent. Thought process, content and associations
> are concrete, odd social mannerisms, tends to minimize
> problems and behaviors and is very circumstantial or

tangential on certain topics, somewhat paranoid against
others even though in his own family. . . . Concentration
slightly impaired. . . . Insight and judgment is limited.

Dkt. #7, p.521.

On May 5, 2014, the therapist with Child & Family Services provided

plaintiff and his grandmother with information about accessing the Personalized

Recovery Oriented Services ("PROS"), program.[2] Dkt. #7, p.456.

Progress notes from Child & Family Services therapy sessions note that

plaintiff's grandmother called Crisis Services on May 14, 2014 regarding plaintiff's

expression of suicidal intent, determining that plaintiff "appeared to need to talk about

current stress (conflict with grandmother, anxiety about returning to school)." Dkt. #7,

p.455.

A psychiatric progress note from Dr. Giessert dated June 17, 2014

includes the following mental status exam:

He is mostly cooperative with fair to intermittent eye contact,
appropriate hygiene, dressed in casual clothes. No abnormal
movement. Gait and station are within normal limits. He has
odd social mannerisms and goes off on tangents. Speech is
rambling and monotone, but otherwise coherent, somewhat
loud, mood is stated as "I'm still anxious and depressed, but

---

[2] PROS is a comprehensive model that integrates rehabilitation, treatment and support
services for individuals with serious mental illnesses, with a goal of promoting independence
and improving quality of life through, *inter alia*, social and basic life skills training, problem
solving and coping skills, housing assistance, vocational training, clinical counseling and health
assessment and symptom monitoring and medication management. www.omh.ny.gov

the Prozac has helped." His affect is somewhat anxious and irritable at times. Thought process, content and associations are concrete, odd, tangential and difficult to redirect, minimize problems and behaviors, paranoid against others even though is in his own family. . . . Concentration is impaired. Language and fund of knowledge are within normal limits. Insight and judgment limited.

Dkt. #7, p.519.

At a family therapy session with Child & Family Services on June 18, 2014, plaintiff was reported to present with an irritable mood and constricted range of affect with a disheveled appearance. Dkt. #7, p.457. He was encouraged to move forward with PROS, "as little is changing at home with mood, anxiety, and hygiene/ADL skills." Dkt. #7, p.457. Plaintiff reported that he was not accepted back to Erie Community College. Dkt. #7, p.457.

On July 12, 2014, plaintiff underwent a mental health assessment at ECMC following an argument with his grandmother, who called 911. Dkt. #7, p.567.

On August 5, 2014, Licensed Creative Arts Therapist ("LCAT"), Rachel Sikorski at Child & Family Services completed the following progress note:

[Plaintiff] engaged well overall, despite irritability towards his grandmother. They are still waiting on SSI and recently applied for public assistance. [Plaintiff] is concerned about the fact that this will require him to find employment. Writer followed up on status of participation with Lakeshore PROS program. [Plaintiff] admitted he has been too preoccupied with current stress to proceed. writer encouraged pursuit and application for [Single Point of Access ("SPOA")],so [plaintiff] could get outside services; writer was firm about the need to

consider living elsewhere, as his functioning has declined and conflict with his grandmother continues. Writer provided psycheducation at length on trauma, as it relates to [plaintiff's] fear of abandonment ("she doesn't want me to live with her"). Writer was firm with grandmother about her need to care for herself and to allow [plaintiff the] chance to become more independent *via* a community service provider.

Dkt. #7, p.584.


On August 18, 2014, Dr. Geissert notes that plaintiff continues to describe much stress and anxiety although he does state that he has been noncompliant with his medications since his grandmother has given them to him to control. Dkt. #7, p.582. Dr. Geissert notes that plaintiff

> struggles to manage in his grandmother's home and can be quite hostile to her even during the appointment he was arguing with her despite her being very appropriate during the appointment. His progress has been minimal in both therapy as well as med management appointments and his behaviors have been somewhat hostile and have regressed over time. It has been stressed to [plaintiff and his grandmother] that independent living situation or housing accommodations will be much better for [plaintiff] in time as they would help him with all of his functioning as well as help him become more independent in time. . . . he remains resistant to taking medication on daily basis to target his symptoms. He also had a Crisis Services and CPEP visit last month due to conflicts in the home and physical struggle with grandmother.

Dkt. #7, p.592. On the same date, LCAT Sikorski noted that plaintiff's psychiatric appointment resulted in plaintiff's grandmother being "in charge" of medication to ensure that they are being taken as prescribed. Dkt. #7, p.585. During their session, LCAT Sikorski created a chart centering on three expectations for plaintiff: (1) bringing

laundry and bottles down from his room; (2) brushing his teeth; and (3) cleaning the tub after every bath. Dkt. #7, p.585. If plaintiff could meet these expectations, his grandmother agreed to allow plaintiff time in the kitchen, despite her concerns about cleanliness. Dkt. #7, p.585.

On November 10, 2014, LCAT Sikorski noted the following mental status exam:

> Plaintiff was groomed; thoughts and speech were coherent; [plaintiff] tends to get really worked up over things he cannot control; he seems to be more pessimistic and focused on things that are wrong rather than things he can change; [plaintiff] stated he makes passive [suicidal] statements with no intent to hurt himself.

Dkt. #7, p.625.

On December 5, 2014, plaintiff focused on his social relationships, acknowledging that people like his grandmother

> continue to feel he cannot get past the past but he stated he is not stuck in the past he is just a realist and recognizes that terrible things were done to him. [Plaintiff] talked about his sister and the loss of that relationship. He also talked about his two best friends. With [plaintiff] talked about what kind of supports he wanted and how many close relationships he wanted to have. Per [plaintiff] he wanted social relationship, be he admitted due to his awkwardness he was unsure what he wanted them to look like.. . . Talked about [plaintiff's] continue[d] struggle to interact with others and get back involved in activities.

Dkt. #7, p.627.

On January 20, 2015, plaintiff established a goal of two sessions of laser tag as a way to start getting out and being active, starting in February. Dkt. #7, p.628.

A progress note dated March 2, 2015 addressed the pros and cons of allowing plaintiff to use the oven at least once a week and the microwave as necessary so that plaintiff could gain some independence with his food. Dkt. #7, p.615.

A progress note dated March 16, 2015 noted that plaintiff discussed his feeling a lack of support from his grandmother and godfather because they wanted him to start working on his goals. Dkt. #7, p.615. Plaintiff expressed his dissatisfaction with the way they try to get him motivated. Dkt. #7, p.615.

On March 30, 2015, plaintiff discussed with his therapist

> his continued depressed mood due to him continuing to not make any real changes just talk about making changes. [Plaintiff] talked a lot about [grandmother] and what he feels she is doing wrong. as well as his godfather and what he feels he is doing wrong. Talked with [plaintiff] about not focusing on them and instead focusing on his self and what he wanted to do to live a better life. Stated [plaintiff] talks a lot about plans but does not follow through and then tries to blame his loved ones for why he doesn't do well.

Dkt. #7, p.616.

On July 13, 2015, Dr. Giessert noted that plaintiff continued to experience anxiety, despite compliance with his medication, noting the following mental status examination:

He is cooperative, fair to intermittent eye contact, appropriate hygiene, dressed in casual clothes. He is overweight. No abnormal movement. Gait and station are within normal limits. He has odd social mannerisms and goes off on tangents. His speech is rambling and monotone, but otherwise coherent, sometimes loud. His mood is stated as "I'm okay, but I am getting anxious." His affect is more euthymic and mood congruent. Thought process, content and associations are concrete, tangential, difficult to redirect, sometimes paranoid against others, even those of his family. No evidence of hallucinations or delusions presently. He is denying any thoughts of wanting to hurt himself or other people, but does have a history of passive suicidal ideation and a history of aggression. He is alert and oriented x3. Memory is globally intact. Concentration is slightly impaired. Language and fund of knowledge are within normal limits. Insight and judgment are limited.

Dkt. #7, p.644.

On August 3, 2015, it was noted that plaintiff did not turn in his FAFSA as part of his goal to return to college classes because he lost it. Dkt. #7, p.672.

On August 17, 2015, Joann Speight noted that plaintiff

tried to blame grandmother for all his misery since he was 5. He stated that although he sees her as a support he also feels she is not helping him by yelling at him and comparing him to his mother. Talked about all the behaviors he has been displaying lately and what grandmother means when she states he is like his mother. Also discussed [plaintiff] stating he is past his traumas however they are the focus of his life and affect his functioning. [Plaintiff] stated he has problems thinking about the future because he is not sure what it would look like and struggles to make it through the day most of the time. [Plaintiff] however was able to admit that he is not trying to improve his situation and often gets mad when grandmother suggests things he can do to improve his situation.

Dkt. #7, p.672.

On September 1, 2015, plaintiff expressed an interest in learning to do laundry. Dkt. #7, p.673.

On September 22, 2015, plaintiff reported that he had obtained an application for a part-time job from Game Stop. Dkt. #7, p.674.

On November 24, 2015, Dr. Geissert noted that plaintiff "continues to have odd social interactions with other people and talk on about many topics of his own choosing." Dkt. #7, p.681.

On October 20, 2015, Joann Speight noted that plaintiff "was able to admit he was afraid of failure and the lack of finances had him worried and he was also unsure what to do because he knows he is not ready for an intense program." Dkt. #7, p.683. After discussing options, plaintiff stated he would get a haircut and turn in his application for Game Stop. Dkt. #7, p.683. Plaintiff achieved these goals by his appointment on November 17, 2015, where he appeared "genuinely happy as evidenced by smiling." Dkt. #7, p.684. He advised that he was "working on cooking and thinking of laundry." Dkt. #7, p.684.

On January 19, 2016, plaintiff discussed with Joann Speight his "wish to work" but agreed with therapist that he "would struggle working a full-time job." Dkt. #7, p.702.

On June 28, 2016, Dr. Geissert noted the following mental status examination:

> he is obese, cooperative with fair to intermittent eye contact, fair hygiene, dressed in casual clothes. . . . He has odd social mannerisms, and goes off on tangents. His speech is rambling and monotone, but otherwise coherent, sometimes loud. Mood is stated as "I'm getting upset at home with my grandmother." His affect is somewhat irritable, mood congruent. Thought process, content and associations are concrete, tangential, difficult to redirect at times, though paranoid against others. . . . Concentration is somewhat impaired. . . . Insight and judgment are slowly improving.

Dkt. #7, p.733. Dr. Geissert noted that plaintiff talks about getting a job, but has not made much progress in doing so and that he has not contacted Adult Career and Continuing Education Services - Vocational Rehabilitation ("ACCES-VR"),[3] even though he understands that it could be helpful to him. Dkt. #7, p.733.

On August 1, 2016, after plaintiff continued to fail to complete ACESS-VR application, plaintiff's therapist helped him complete the application. Dkt. #7, p.745. On August 30, 2016, Dr. Geissert noted that plaintiff has not made contact with ACESS-VR. Dkt. #7, p.791. At that appointment, his speech was noted to be "rambling and monotone, somewhat loud." Dkt. #7, p.791.

---

[3] ACCES-VR "starts with the presumption that individuals with disabilities can benefit from vocational rehabilitation services and should have opportunities to work in jobs integrated within their communities. Their mission is to assist individuals with disabilities to achieve and maintain employment and to support independent living through training, education, rehabilitation, and career development. www.acces.nysed.gov

Plaintiff's therapy session of September 27, 2016, addressed plaintiff's interest in finding a job to expand his minimal social supports and improve his relationship with his grandmother. Dkt. #7, p.840. Plaintiff had completed some applications, but did not get the jobs, recognizing that he does not have much to put on his resume. Dkt. #7, p.840. LCSW Speight reported that plaintiff had limited judgment and insight, although he was more open to trying new things and was not making as many excuses. Dkt. #7, p.840. LMCSW Speight suggested a job coach and training class to obtain skills to get a job and advised that he should be considered for a higher level of care if he was not able to make progress on this goal. Dkt. #7, p.840.

On October 18, 2016, plaintiff agreed with LCSW that he needed to contact ACCESS-VR to get training and obtain a job. Dkt. #7, p.840. On October 20, 2016, plaintiff advised that he was unable to find the application. Dkt. #7, p.841.

On November 15, 2016, LCSW Speight noted that plaintiff finally had an appointment with ACESS-VR. Dkt. #7, p.842. She reported that plaintiff

> says he wants to be more independent but is not trying. [Plaintiff] also not trying to interact with his family and tends to continue to stay to his self. [Plaintiff], writer and grandmother discussed the need for him to begin to do things on his own. He tried putting everything on his grandmother but then admitted he is not trying. Discussed with [plaintiff] the supports and resources he would have if his grandmother was not there. He stated they were still limited and that he was not doing much to improve them.

Dkt. #7, p.842.

On December 2, 2016, LCSW Joann Speight and LMHC Nicole Clark

completed a Child and Family Services family Mental Health Program Adult

Comprehensive Assessment in which they reported that plaintiff's

> emotional instability and helplessness both personal and
> encouraged by grandmother has lead [sic] him to avoid
> situations he feel [sic] may trigger his anxiety. [Plaintiff]
> refuses to take daily medication or regularly use skills
> despite say [sic] he is anxious and depressed. He has been
> given several programs and linked with calls from the office
> but then fails to follow through with the appointments. His
> grandmother states she wants him to improve but at time will
> interfere with him going to appointments. She also refuses to
> let him do things at home but then says he does not know
> how to do anything. [Plaintiff] often comes up with lots of
> excuses as to why he cannot accomplish a goal. When
> given encouragement he sometimes tries to negate it. He
> still struggles with making in person relationships but also
> refuses to go do any activities where he could meet people
> his age. Writer and [plaintiff] have agreed that he will take
> things in smaller portions but he has to try something before
> he says he cannot do it.
>
> [Plaintiff's] emotional instability restricts his ability to deal
> with common everyday issues like the way teachers talk to
> him, he feels they should be more sensitive to people with
> disabilities and when they treat him like other students he
> becomes upset. He appears to take a lot of his frustration
> out on his grandmother. Because he is articulate and well
> versed in some topics he has a tendency to not listen to her.
> He has also made some questionable friendships on-line
> and in one instance ended up in the hospital due to believing
> that an on-line [friend] had died.

Dkt. #7, p.823.


On January 23, 2017, plaintiff reported that "he was able to go out with his

godfather recently to dinner and states that this was a very good time." Dkt. #7, p.787.

As the record demonstrates, plaintiff has been living in a highly structured environment in which his grandmother has closely monitored his medication, cajoled basic hygiene and provided for his basic needs. Recognizing independence from his grandmother as a goal, plaintiff's therapist created a reward chart to encourage plaintiff to, *inter alia*, brush his teeth. A supported living environment was repeatedly recommended, yet plaintiff was unable to follow through with accessing PROS. Plaintiff was unable to complete his first semester of college and was only able to complete his FAFSA application in pursuit of his goal to return to college classes by completing the form with his therapist. He subsequently failed to file the form and ultimately lost it. Although referred by his mental health providers to ACCES-VR in support of his goal of obtaining employment, plaintiff was unable to follow through with accessing the program. Dr. Geissert, who the ALJ acknowledged as a specialist in psychiatry who had treated plaintiff regularly for years, noted minimal improvement and even regression in plaintiff's mental status during the relevant time period for plaintiff's disability application. Although preceding plaintiff's disability application by several months, a neuropsychologist also noted the lack of improvement in plaintiff's longstanding symptoms despite many years of treatment and opined that plaintiff's psychiatric symptoms were likely to persist and interfere with work productivity, making maintenance of employment very difficult. These opinions, which are consistent with plaintiff's treating records, demonstrate that the ALJ's determination is not supported by substantial evidence and that plaintiff has met his burden of proof to qualify for disability pursuant to paragraph C of Listing 12.04.

**CONCLUSION**

Based on the foregoing, plaintiff's motion for judgment on the pleadings (Dkt. #12), is granted and this matter is remanded for calculation of benefits and the Commissioner's motion for judgment on the pleadings (Dkt. #15), is denied.

The Clerk of the Court is directed to close this case.

**SO ORDERED.**

**DATED:**      **Buffalo, New York**
               **March 12, 2020**

                         _s/ H. Kenneth Schroeder, Jr._
                         **H. KENNETH SCHROEDER, JR.**
                         **United States Magistrate Judge**